THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JENNY DE LEÓN CLAUDIO, Defendant and Appellant.

No. CR-69-36.        Decided June 30, 1970.

262

*Benjamín Ortiz* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Federico Rodríguez Gelpí, Assistant Solicitor General,* for The People.

PER CURIAM: Appellant was convicted by a jury and was sentenced to a penalty of from 2 to 4 years in the penitentiary for the commission of an offense of grand larceny.

Requesting from us to reverse said judgment, she assigns the commission of several errors.

In the first two she assigns that the evidence for the prosecution is inherently incredible, improbable, contrary to the realities of the natural course of things and unworthy of credibility, and that the jury fell into error by giving credit to the testimony of Pablo Ramos Acevedo.

Appellant is wrong. The evidence for the prosecution as summarized by the Solicitor General is as follows:

"On December 22, 1967, at about 10:30 p.m., Pablo Ramos Acevedo went with his nephew called Vicente Burgos Ramos to the Bar Las Vegas in the area of Puerta de Tierra. They sat at a table and ordered two *cuba libres*. While they were drinking there defendant-appellant arrived with another young woman and they asked the witness and his nephew if they would buy them some drinks. They agreed and they sat at the table. Ten or fifteen minutes later the witness took out some money to pay for the round of drinks, and then the defendant-appellant invited him to dance. They danced, they sat again and they took another drink. Again the witness took out his money to pay and then defendant-appellant invited him to go to a hotel located in the same area as the Bar Las Vegas. The witness accepted after fixing the price for the company of defendant at $40 for one hour. (Tr. Ev. 1–11.)

"They went to the hotel in question and once they were in the room the witness checked the same, looking into the bathroom and under the bed. Defendant-appellant ordered some drinks from an employee and again the witness took out the pack of money to pay them. The pack in question contained one hundred, fifty, twenty, ten, and one dollar bills. (Tr. Ev. 10–12.) Then, as reported by the witness, the following thing occurred: (Tr. Ev. 14, 15, and 16)

"A. That night I had $2,026.00, then I took out a ten-dollar bill and I gave it to her to pay the man who was waiting on us, then she told him 'keep the change' then I asked her why had she done that, it was hard for me to earn that money, then she answered 'don't worry you have a lot of money,' and then I told her 'but it was hard for me to earn that money because it has taken me a lot of time to earn it,' but she kept on caressing me and we forgot about it, and it was then that we went to bed, and then it was immediately over for she got up and since she had agreed to stay for an hour I saw her going into the washroom, she washed and changed her clothes, then I asked her if she had not told me that she was going to stay with me for an hour; then she answered me that she was going to a friend of hers who lived, who was in another room and that she was coming back immediately. When she answered those words I went back to bed again, naked as I was, in the bed looking upwards and I told her, 'all right, but hurry.' Immediately I stayed looking upwards and I saw out of the corner of my eye that my trousers were moving and immediately I looked and I saw that she was taking my money.

JUDGE:—

One moment. Go on.

A. Then since I was completely naked I tried to hold her and then and there she pushed the door which was slightly open and she ran off. There the only thing I could do was to shout to the cashier: 'take that woman, she took all my money' or $2,000 I had and then the cashier's answer was . . .

JUDGE:—

One moment. The cashier's reply is immaterial.

Q. You shouted to the cashier what you said.

A. Yes, sir.

Q. And what did she do?

A. I cried out to him.

Q. What did she do?

A. She immediately took the elevator and went down because even the elevator was open.

Q. Did you see her again?

A. I saw her again 3 or 4 days later when the detective arrested her and took her to my home and I was not there and then I was able to recognize her at the police station.

"Concerning the stolen money the witness testified that '1 had' $2,026.00. Of that amount he had borrowed $500 from his brother-in-law that same day and the rest came from a compensation of the State Insurance Fund. Of that amount he used $100 which he delivered to the nephew who accompanied him and $40 which he paid to defendant-appellant. (Tr. Ev. 16 and 17.)

"On cross-examination he testified that he had never before been in the Bar Las Vegas and that he did not know defendant until the day of the events. (Tr. Ev. 21, 22, and 26.) He also described how he had placed his trousers with the money over a table and how defendant changed it from its place hanging it from a hinge to prevent it from getting wet. (Tr. Ev. 36 and 37.)

"The witness testified that the day of the events he had left his house in Guaynabo looking for some masons; that he was driving his own automobile and that they had not entered any place whatsoever except the masons' house. (Tr. Ev. 48 and 49.) In regard to the circumstances under which the money was removed from the trousers, he testified having seen defendant putting her hand in the trouser pocket and taking it out with the money. (Tr. Ev. 54, 58, 59, and 61.) He testified he did not have any argument with defendant (Tr. Ev. 62) and that after the theft defendant had immediately gone down in an elevator. (Tr. Ev. 63 and 64.) The witness in turn got dressed and went after defendant going down the stairs. He complained to the manager but was unable to catch defendant. (Tr. Ev. 71 and 73.) The manager called the police and the witness waited for them, leaving after the police 'took notes.' (Tr. Ev. 76.)

"The witness continued testifying on cross-examination that besides his nephew and the women, nobody else had been at the table, (Tr. Ev. 78) that he had handed the one hundred dollars to his nephew at the table and that the latter had later returned

eighty dollars to him, and that he had taken out the pack of money three times while they were sitting at the table. (Tr. Ev. 79–80.) He testified that he had seen the masons he had contracted to repair his house at about 8:00 o'clock or 8:30, going later to the Las Vegas Bar, (Tr. Ev. 91 and 92) accompanied only by his nephew. (Tr. Ev. 94.)

"The witness for the prosecution, Juan Bautista Nieves, testified that he was the cashier of the Hotel Royal, he testified that he knew defendant and having seen her with the witness Pablo Ramos Acevedo the day of the events and having rented a room to both of them. (Tr. Ev. 104–107.) He later saw defendant leaving and going down in the elevator and witness Ramos claiming from defendant 'give that to me' and going later down the stairs. Later on he saw witness Ramos return with the police. (Tr. Ev. 106–108.)

"On the cross-examination he testified that the incident had occurred at about 11:00 o'clock (Tr. Ev. 109) although he later said that witness Ramos and appellant had arrived at the room from 2:30 to 3:00 o'clock. (Tr. Ev. 114.) He testified that he had heard defendant and the witness Ramos arguing in the room (Tr. Ev. 111) and that after the incident the witness had returned to his room to take a shower." (Report of the Solicitor General, pp. 4 to 8.)

■ That evidence is substantially corroborated by the testimony of defendant herself except for the fact of her having put her hand into the pocket of the trousers of the aggrieved party and stealing his money. Her version, which the jury did not believe, was to the effect that the money which the aggrieved party asked her to return were the $20 he had paid for her favors. We cannot rely on insignificant details in the testimony of the aggrieved party to judge same unworthy of credit. As the Solicitor General maintains his testimony in regard to the events is not improbable and having deserved credit from the jury, it is sufficient to support appellant's conviction. *People* v. *García Félix,* 90 P.R.R. 153 (1964).

■ The trial court did not commit error, as it is alleged in the third assignment, upon instructing the jury as to the

impeachment by the prosecuting attorney of the witness for the prosecution Juan Bautista Nieves, for alleged contradictory statements, nor did the judge tell the jury that the prosecuting attorney had destroyed said witness' credibility.

Although the instruction given to the jury by the judge in accepting in evidence the sworn statement of the witness for the prosecution Juan Bautista Nieves to impeach his credibility could have been clearer, after considering the same in its entirety, and defendant not having objected to the same, we do not believe that it has injured appellant's substantial rights, and the judgment appealed from should not be reversed relying on that instruction. Said instruction reads as follows:

"Ladies and gentlemen of the jury, in connection with this statement which the Court has admitted, and which the prosecuting attorney had offered, I instruct you as follows: you cannot consider to any effect the contents of this statement as establishing positive evidence or of any kind leading to establish defendant's guilt. The evidence which you have to analyze in order to decide whether or not this defendant is guilty of the offense charged against her is the testimony of Juan Bautista Nieves Rodríguez, with which we are concerned at this moment, the testimony which he delivers before you in court and at the trial. It is on the basis of that testimony that you have to decide weighing, appraising the scope it has, if any, in connection with defendant's alleged guilt. This is so because these statements are taken ex parte, in other words, without defendant having had the opportunity of facing the person who gives said statement in order to question the same in regard to his statement of the facts, its credibility, etc. The statement has been offered by the prosecuting attorney for the purpose, and the Court has admitted it for those sole purposes, of challenging, injuring, before you, the testimony of a witness of the prosecuting attorney himself named Juan Bautista Nieves. A person, a party presents a witness and that party is bound as to the credibility of that witness. Then the prosecuting attorney, in presenting here Juan Bautista Nieves, was bound for the credibility of his testimony before you, but then the prosecuting attorney destroys that

same credibility of that witness for which he has been bound offering the latter's previous statement. You may believe that this man said the truth in this statement and that he did not say the truth here; you may decide on the truth which you understand he may have said in this statement. I repeat, you have to resort to what he has said in court before you, under oath, in order to decide what kind of credit, importance, and merit you give to this testimony of his in court, but never, I repeat, may this statement be considered as evidence against defendant. Go on. What else?" (Report of the Solicitor, pp. 11 to 13.)

The fourth assignment refers to the instructions given to the jury in regard to the impeachment of witness Vicente Burgos Ramos for previous contradictory statements. The error was not committed.

■ Witness Burgos Ramos was waived by the prosecuting attorney as witness for the prosecution because it was cumulative evidence. The defense presented him as its witness. In order to impeach him for previous contradictory statements the defense presented the testimony of attorney Manuel García Marrero. The court did not err by instructing the jury to the effect that Burgos Ramos was a witness for the defense for as such he was used by the latter. Besides, the court instructed the jury correctly when it told them that the testimony given by attorney García Marrero in court was not direct evidence of the facts leading to the acquittal of defendant and that it had been admitted for the sole purpose of challenging the credibility of witness Burgos Ramos.

■ In the fifth assignment the court is charged with having made injurious statements against defendant in the presence of the jury and in the ninth assignment it is argued that it was an error to allow the prosecuting attorney to ask questions regarding Tursi.

Both assignments are worthless. The judge asked a witness: What kind of work does Jenny do there? Several witnesses testified, in regard to defendant's work, and she herself admitted in the witness stand that her work consisted

in entertaining the clients of the business drinking liquor with them and engaging later in sexual relations for payment. Defendant herself testified that she was employed by Tursi and to questions of the prosecuting attorney asking whether Tursi had bailed her in no way whatsoever prejudiced her rights.

■ It was not an error either, as it was alleged in the sixth assignment, the fact that the judge ordered the elimination of part of the testimony of witness Juan Maldonado to the effect that the aggrieved party had told him that some of his money was missing but was not sure whether it had been her. Aside from the fact that no grounds were established to challenge the aggrieved party's direct testimony, defendant did not complain of the action of the judge, nor is the incident invested with such fundamental importance as to lead us to consider it even though there was no objection or protest of the defendant. *People* v. *Pimentel Camacho*, 89 P.R.R. 132 (1963).

■ The seventh error, assuming that the same was committed, does not warrant the reversal of the judgment. The judge ordered to strike out an answer of witness Juan Maldonado in the sense that the prejudiced party told him "that he had missed $1,800.00, and later $500, and later he said that he did not know how much money was missing." After that strike out was ordered, the witness continued testifying that the aggrieved party mentioned to him two different figures. That part was not stricken out. Thus the defense succeeded in conveying to the jury what it intended, that is, that the aggrieved party had told witness Maldonado that he was not sure of the money he was missing.

■ Finally, the fact that the judge mistakenly said during an argument with the counsel for the defense that a certain witness was for the defense does not entail the reversal of the judgment either. There was no objection to that comment nor was he requested to correct the error. Furthermore,

the defense stipulated that the judge need not sum up the evidence while charging the jury, opportunity during which, probably, the judge would make reference to the witnesses for the prosecution presented by the prosecuting attorney to support the information. In any event, the jury knew that the witness in question had been presented by the prosecuting attorney as evidence for the prosecution. This disposes of the eighth assignment of error.

For the foregoing reasons, the judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein.